UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JOHN F. OSBORN,
      Petitioner,

vs.                                    Case No.:  5:20cv6/RV/EMT

FLORIDA DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner John Osborn's (Osborn) habeas petition filed under 28 U.S.C. § 2254 (ECF No. 1).  Respondent (the State) filed a motion to dismiss the petition as untimely, with relevant portions of the state court record (ECF Nos. 12, 20).  Osborn responded in opposition to the motion to dismiss (ECF No. 17).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the timeliness issue, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of

the undersigned that the pleadings and attachments before the court show that the State's motion to dismiss should be granted as to Issue Two and Issue Three of the § 2254 petition, and that Issue One of the petition should be denied for failing to state a cognizable claim.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 12, 20).  On December 2, 2010, a jury in the Circuit Court in and for Bay County, Florida, Case No. 2009-CF-2683, found Osborn guilty of two counts of possession of a listed chemical with intent to manufacture methamphetamine (Counts I and III) and one count of aggravated child abuse (Count II) (Ex. A at 43–44 (verdict), Supplemental Appendix (trial transcript)).[1]  The trial court adjudicated Osborn guilty of Counts I and II and sentenced him to consecutive terms of thirty years in prison, with a mandatory minimum term of ten years on Count I (Ex. A at 221–27, Trial Transcript at 580–85).  The court determined that Count III was duplicative of Count I and thus did not

---

[1] The court's citations to the trial transcript refer to the State's Supplemental Appendix (ECF No. 20).  The court's citations to all other parts of the state court record refer to the exhibits submitted with the State's motion to dismiss (ECF No. 12).  The court cites to the "Bates stamp" page number of each exhibit.

adjudicate him guilty of impose sentence as to that count (*see id.*).  Osborn appealed the judgment to the Florida First District Court of Appeal (First DCA), Case No. 1D10-6743 (Ex. B).  The First DCA affirmed the judgment per curiam without written opinion on October 5, 2011 (*id.*).  *Osborn v. State*, 70 So. 3d 591 (Fla. 1st DCA 2011) (Table).  The mandate issued October 21, 2011 (Ex. B).

On October 17, 2013, Osborn filed a pro se motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. C).  Osborn filed a counseled amended motion on April 21, 2015 (Ex. D).  On May 14, 2015, the circuit court dismissed the amended Rule 3.850 motion as facially insufficient, with leave to file a second amended motion within sixty days (Ex. E).  Osborn's counsel filed a timely second amended Rule 3.850 motion (Ex. F).  The circuit court summarily dismissed several of Osborn's claims (specifically, Grounds 1, 2, 3, 4, 5, and subpart D of Ground 6) (Ex. G).  The court subsequently summarily dismissed Osborn's remaining claims (specifically, subparts A, B, C, and E of Ground 6) (Ex. H).  Osborn appealed the circuit court's decision to the First DCA, Case No. 1D16-0902 (Ex. I).  The First DCA affirmed per curiam without written opinion on August 22, 2016 (Ex. J).  *Osborn v. State*, 202

So. 3d 411 (Fla. 1st DCA 2016) (Table).  The mandate issued November 4, 2016 (Ex. I).

On May 15, 2018, Osborn filed a second Rule 3.850 motion in the state circuit court, alleging newly discovered evidence (Ex. K).  The circuit court summarily denied the motion (Ex. L).  Osborn appealed the decision to the First DCA, Case No. 1D18-4735 (*see* Ex. M).  The First DCA affirmed per curiam without written opinion on May 22, 2019 (Ex. M).  *Osborn v. State*, 272 So. 3d 377 (Fla. 1st DCA 2019) (Table).  The mandate issued June 19, 2019 (Ex. M).

Osborn filed the instant § 2254 federal habeas petition on January 2, 2020 (ECF No. 1).

The State seeks dismissal of the § 2254 petition as untimely (ECF No. 12 at 7).  The State asserts that the one-year federal limitations period for all of Osborn's claims commenced on January 3, 2012, when Osborn's state conviction became final upon expiration of the ninety-day period for him to seek review of the First DCA's affirmance of the judgment (*id.*).  The State contends Osborn's first application for state post-conviction was filed on October 21, 2013, after the one-year federal limitations period expired; therefore, neither it, nor any other state post-convictions motions filed after that date, tolled the federal deadline (*id.*).

In Osborn's response to the State's motion to dismiss, he argues the State's motion to dismiss does not refute the merits of his habeas claims (*see* ECF No. 17). Osborn also contends the State failed to refute his contention that he is entitled to federal review of the merits of his claims through the "actual innocence gateway" (*id.*).

## II.   DISCUSSION

A one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  *See* 28 U.S.C. § 2244(d)(1). The limitation period runs from the latest of:

> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  The time during which a properly filed application for state post-conviction or other collateral review is pending is not counted toward the one-year federal limitations period.  *See* 28 U.S.C. § 2244(d)(2).

The federal statute of limitations requires a claim by claim approach to determine timeliness in a multiple trigger case.  *Zack v. Tucker*, 704 F.3d 917, 918. 926 (11th Cir. 2013).

**A.    Issue Two:    "Petitioner's 5th Amendment federal constitutional rights and his equal protection rights were violated when his judgement [sic] is based on a [sic] inconsistent verdict."**

**Issue Three:    "Petitioner's 5th, 14th and equal protection right [sic] to the U.S. Constitution was violated when his conviction stand [sic] on prior inconsistant [sic] testimony which does not constitute sufficient comptent [sic] evidence to support conviction and is insufficient."[2]**

In Issue Two, Osborn contends the verdicts were inconsistent (*see* ECF No. 1 at 34–36).[3]  In Issue Three, he contends the evidence was insufficient to sustain his convictions (*id.* at 37–40).  Both of these claims are based upon facts which Osborn knew before his conviction became final.  Therefore, the finality date is the

---

[2] For organizational reasons, the court will address Osborn's claims in a different order than he presented them in his § 2254 petition.

[3]  The court's citations to the parties' pleadings are to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers of the original documents.

appropriate trigger for the federal limitations period as to these two claims. *See* 28 U.S.C. § 2244(d).

For purposes of the limitations period, *see* 28 U.S.C. § 2244(d)(1), Osborn's judgment became final on January 3, 2012, upon expiration of the 90-day period for him to file a petition for review of the First DCA's judgment in the United States Supreme Court. *See* S. Ct. R. 13 ("The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate."); *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) (one-year statute of limitations began to run 90 days from date of entry of state court judgment, not issuance of mandate). The federal limitations period commenced the next day on January 4, 2012. *See* Fed. R. Civ. P. 6(a) ("In computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included." ); *see also Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

The federal limitations period expired one year later, on January 5, 2013. *See, e.g., Downs v. McNeil*, 520 F.3d 1311, 1318 (11th Cir. 2008) (applying "anniversary

method" when calculating one-year limitations period); *Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1289 n.1 (11th Cir. 2007) (noting that limitations period should be calculated using "the anniversary date of the triggering event").  All of Osborn's applications for state post-conviction relief were filed **after** that date; therefore, they did not toll the limitations period.  *See Webster v. Moore*, 199 F.3d 2156, 1259 (11th Cir. 2000) ("A state-court petition . . . that is filed following the expiration of the limitations period cannot toll that period because there is no period remaining to be tolled.").  Osborn filed his federal habeas petition on January 2, 2020, seven years after the federal deadline expired (*see* ECF No. 1).  Therefore, Issues Two and Three are untimely.

Osborn contends he is entitled to federal review of his untimely claims through the "actual innocence gateway" (*see* ECF No. 17).  Osborn's contention will be discussed *infra* in the court's discussion of Issue One.

**A.    Issue One:  "Petitioner was deprived of his federal constitutional rights to due process and equal protection when state court denied his newly discovered evidence in an unreasonable manner devoid [sic] of record support and failed to give 'full and fair' state review, that resulted in fundamental miscarrige [sic] of justice to one who is actually innocent."**

This federal court could liberally interpret Issue One three ways:  (1) a federal constitutional challenge to the process afforded Osborn in the state post-conviction

proceedings, specifically, the court's failure to afford him an evidentiary hearing on his claim of newly discovered evidence; (2) a "freestanding" claim of actual innocence, and (3) a means of obtaining federal review of the otherwise time-barred claims presented in Issues Two and Three. The court will address each possible interpretation in turn.

The Eleventh Circuit "has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief." *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009); *see also Anderson v. Sec'y for Dep't of Corr.*, 462 F.3d 1319, 1330 (11th Cir. 2006); *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987). "The reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—i.e., the conviction itself—and thus habeas relief is not an appropriate remedy." *Carroll*, 574 F. 3d at 1365; *see also Quince*, 360 F.3d at 1261–62; *Spradley*, 825 F.2d at 1568. Furthermore, "such challenges often involve claims under state law—for example, Florida Rules of Criminal Procedure 3.850 and 3.851, which governs the availability of, and procedures attendant to, post-conviction proceedings in Florida—and '[a] state's interpretation of its own laws or rules

provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.'" *Carroll*, 574 F.3d at 1365 (quoting *McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992)).  The Eleventh Circuit has further explained that "[b]ecause of this bar to relief, we have stated it is 'beyond debate' that a state court's failure to conduct an evidentiary hearing on a post-conviction motion does not constitute a cognizable claim for habeas relief." *Carroll*, 574 F.3d at 1365; *see Anderson*, 462 F.2d at 1330; *Spradley*, 825 F.2d at 1567.

Here, the error that Osborn complains of in Issue One occurred during the state post-conviction proceeding, when the state post-conviction trial court denied his claim of newly discovered evidence without holding an evidentiary hearing.  This alleged error does not undermine the legality of Osborn's imprisonment and is based purely on state law, specifically Rule 3.850 and the Florida Supreme Court's interpretation of Florida law and procedural rules.  *See Carroll*, 574 F.3d at 1366 (holding that habeas petitioner's claim that state court violated his due process rights when it summarily denied his post-conviction claim without an evidentiary hearing, did not state a claim on which federal habeas relief could be granted); *Quince*, 360 F.3d 1261–62 (explaining that "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral

proceeding does not state a basis for habeas relief"); *Spradley*, 825 F.2d at 1568 (holding that habeas petitioner's claim that errors in his Rule 3.850 proceeding violated his due process rights did not state basis for habeas relief because the claim "[went] to issues unrelated to the cause of petitioner's detention").  Because Issue One is based upon alleged defects that occurred in the state post-conviction proceeding and not Osborn's trial, it does not state a cognizable claim for federal habeas relief.

Likewise, to the extent Osborn presents a freestanding claim of actual innocence in Issue One, that claim is also not cognizable.  The function of federal habeas corpus is to redress constitutional errors, not to relitigate state criminal cases. *See Herrera v. Collins*, 506 U.S. 390, 401 (1993).  Consequently, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera*, 506 U.S. at 400; *see also Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007) (explaining, after declining to consider freestanding claim of actual innocence because it did not fall within certificate of appealability order, "our precedent forbids granting habeas relief based upon a claim of actual innocence, anyway, at least in

non capital cases"); *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (citing *Herrera*) ("It is not our role to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial.").

To summarize thus far, to the extent Issue One presents a challenge to the state post-conviction court's failure to hold an evidentiary hearing on Osborn's claim of newly discovered evidence, and to the extent Issue One presents a freestanding claim of actual innocence, neither of those claims is cognizable in federal habeas. Therefore, relief on Issue One should be denied to the extent it is based on those claims.

This leaves the third interpretation of Issue One, i.e., that the "newly discovered evidence" described therein provides a gateway through which Osborn may obtain federal review of the time-barred claims presented in Issues Two and Three.

Under the AEDPA, a "credible showing of actual innocence" provides a "gateway" through which a petitioner may pursue his claims on the merits notwithstanding his failure to file his habeas petition within the statute's otherwise applicable limitations period. *McQuiggin v. Perkins*, 566 U.S. 383, 386 (2013). To pass through this gateway, however, a petitioner must satisfy the standard for actual

innocence articulated by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298 (1995). Under *Schlup*, a petitioner must show that, in light of newly presented evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *id.* at 327, or, to remove the double negative, "that more likely than not any reasonable juror would have reasonable doubt," *House v. Bell,* 547 U.S. 518, 538 (2006).

Schlup makes clear that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. This new evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. *See Sibley v. Culliver*, 377 F.3d 1196, 1207 (11th Cir. 2004). The new evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial." *Schlup*, 513 U.S. at 327 (internal quotation marks omitted).

Because this court must consider the trial record as a whole, the court will summarize the most significant trial evidence.[4] Osborn's convictions for possession

---

[4] Some of the trial evidence was cumulative and will not be included in the summary.

of a listed chemical with intent to manufacture methamphetamine and aggravated child abuse arose from a fire that occurred on August 23, 2009, at a trailer he shared with his two children, Johnna and Cole, and the children's mother, Tessa Wagy (*see* Supplement Appendix containing Trial Transcript, ECF No. 20).

Michael Frank testified he was a retired firefighter of eighteen years and served as a fire chief for ten years (Trial Transcript at 34, 50). Mr. Frank testified that on the night of the fire (August 23, 2009), he was living with Joy Martin and their children, and his ex-wife, Raquel Frank, was staying with them (*id.* at 34–35). Mr. Frank testified that his trailer neighbored Osborn's trailer (*id.*). Mr. Frank testified that at approximately 10:00 p.m., he heard a woman between their trailers yell that there was a fire, and she needed help (*id.* at 35–36). Mr. Frank testified he alerted his girlfriend (Ms. Martin) and his ex-wife (Ms. Frank, who was also a fireman), and then he ran to Osborn's trailer (*id.* at 36). Mr. Frank testified he saw burning material on the ground between their trailers, and he also saw an infant girl on the ground (*id.* at 36–37). Mr. Frank later discovered that the burning material was a playpen (*id.* at 45). Mr. Frank testified he ran into Osborn's trailer, and Osborn was the only person inside (*id.* at 37). Mr. Frank testified Osborn was standing just inside the front door holding a frying pan (*id.* at 37–38). Mr. Frank testified that a

substance on the carpet directly behind Osborn was burning, and the corner of the couch behind that area was burning (*id.* at 38). Mr. Frank testified he went to the kitchen, grabbed another frying pan, filled it with water, and doused the flames (*id.*). Mr. Frank testified he smelled a strong odor of cooking grease, but he did not see any grease or oil in the kitchen, on the stove, or on the floor (*id.* at 41–42, 52). He also testified he did not see any potatoes in the kitchen, on the stove, on the floor, or in the frying pan that he picked up in the kitchen (*id.* at 42). Mr. Frank testified he did not detect any odor of chemicals (*id.* at 52–53). Mr. Frank testified that after he doused the flames, he got a hose from his trailer and sprayed the area with "a loose drizzle of water" to completely extinguish the fire (*id.* at 53–54). Mr. Frank testified that he was careful not to disturb or damage any potential evidence (*id.*). He also testified that fires caused by methamphetamine production did not occur when he was a firefighter, so he was not certified or trained to investigate meth labs or remove meth materials, and he was not familiar with odors associated with meth or in the chemical precursors to meth (*id.* at 55–56).

Mr. Frank testified that Joy Martin called 911, and he heard Osborn say not to call 911 (Trial Transcript at 39). Mr. Frank testified that firefighters and paramedics arrived approximately ten minutes later (Trial Transcript at 39–40). Mr. Frank

testified he provided a statement to one of the investigators at 12:30 a.m. in the early morning of August 24, 2009 (*id.* at 40).

Mr. Frank testified he saw Osborn approximately one hour later (between 1:30–1:45 a.m.) at the dumpster on the property (Trial Transcript at 40–41). Frank testified that Osborn told him that the fire was a grease fire, and it "exploded" after he put water on it (*id.*).

Investigator Duane Johnson testified he searched the dumpster and found a "white flex style garbage bag [with] red bandied ties" in the dumpster (Trial Transcript at 150). The garbage bag contained the following: a food stamp receipt bearing the name "Tessa Wagy," a lithium battery that had been cut open, and two empty blister packs for cold and allergy relief tablets (*id.* at 150–53). Law enforcement officers also found trash bags inside Osborn's trailer that looked the same as the trash bag retrieved from the dumpster (*id.* at 209–10).

Joy Martin testified that two children lived in the Osborn trailer, a boy who was approximately two months old, and a girl who was approximately one year old (Trial Transcript at 57–59). Ms. Martin testified that on the night of the fire, she saw the little girl sitting on the ground, not moving or crying, with burned hair and burns on her face, stomach, and legs (*id.* at 59, 62–63). Ms. Martin testified that the

children's mother, Tessa, asked her, Mike Frank, and Raquel Frank to take care of

the two-month-old boy for a couple of hours while she accompanied her daughter to

the hospital (*id.* at 63, 65). Ms. Martin testified that after the fire, investigators gave

her permission to enter Osborn's trailer to grab diapers for the baby (*id.* at 63–64).

She testified that a fireman walked into the house behind her (*id.* at 65). Ms. Martin

testified that the EMS and investigators were at the scene for several hours (*id.* at

65–66).

Mr. Frank testified that on September 1, 2009, eight days after the fire, his

ten-year-old son notified him of several items hidden under a storage trailer located

near his and Osborn's trailers (Trial Testimony at 45-46). Mr. Frank testified he

looked under the storage trailer and saw a white plastic bag and gallon jugs of

material (*id.* at 46). Mr. Frank testified he did not disturb the items and notified law

enforcement (*id.*).

Investigator Steve Retherford and Investigator Duane Johnson investigated

the storage trailer and found several items, including a Dollar General bag, a cold

pack containing ammonia nitrate, empty pseudoephedrine blister packs, a jug of

muriatic acid, a Coleman fuel can, a measuring cup, a bottle of lye, and a water bottle

containing lithium strips from a lithium battery (Trial Transcript at 137–57). The

items under the storage shed were identified as belonging to Osborn, because Osborn's fingerprints were found on the Coleman fuel can (*id.* at 380–81).

Don Cioeta, an investigator with the State Fire Marshal (SFM), testified that he arrived at the scene of the fire at 10:56 p.m. on August 23, 2009 (Trial Transcript at 80). Investigator Cioeta testified that outside the trailer, he saw several items in the yard, including a pot, but there was no scorching, soot, or burn marks on it (*id.* at 83–84). Cioeta testified that as he approached the front door, he saw a frying pan on the porch that was discolored from burning; and he also saw a food product, which appeared to be discolored noodles or potatoes and onions inside the pan (*id.* at 85). Investigator Cioeta testified he saw a third pan, which did not have any oil, grease, smoke, or soot, or fire damage (*id.* at 85–86). Investigator Cioeta testified he saw a couch with a lot of burning to the top, seat, and one arm (*id.* at 86). He testified he also saw a burned playpen (*id.* at 88).

Investigator Cioeta testified he determined that the couch and playpen were in the living room at the time of the fire (Trial Transcript at 88). He testified that he saw the same noodle or potato product on the living room floor and on the couch (*id.* at 89). Investigator Cioeta testified that, based upon the size and shape of burn marks in the home, it appeared that a burning object had come from the kitchen area and

been dropped in the living room (*id.* at 89–90). Investigator Cioeta testified he saw a bit of grease around the left front burner of the stove (*id.* at 93). He testified that the oil did not appear to be fresh, and it looked as though it may have been there from prior cooking (*id.* at 93–94). Investigator Cioeta testified he did not observe any grease, oil, soot, or smoke damage to the white counter tops or cabinets in the kitchen (*id.* at 94). Investigator Cioeta testified he collected burned samples from the couch and living room floor, and submitted the samples to the lab for testing (*id.* at 96–98). Cioeta testified he was at the scene for approximately two hours (Trial Transcript at 99).

Investigator Cioeta testified that after he initially investigated the scene, he did not form a complete opinion about the cause of the fire (Trial Transcript at 100–01). He testified he still had some questions and "had in my mind an undetermined fire at that point in time, pending further investigation" (*id.*). Investigator Cioeta testified that once he completed his investigation and learned the results of the lab testing, he determined that the fire was "an incendiary fire as a result of a type of process of a manufacturing of methamphetamine (*id.*).

On cross-examination, Investigator Cioeta testified that while he was at the scene, he smelled grease and food products (Trial Transcript at 105). Cioeta testified

that while he was on the scene, he told Bay County Sheriff's Office (BCSO) Investigator Haire that he had preliminarily determined that the fire was a grease fire, based upon the burn marks, smoke patterns, and damages (*id.* at 106–11). Cioeta testified that he was familiar with odors associated with methamphetamine fires, and he did not detect any such odors at the scene (*id.* at 117–18). Investigator Cioeta testified he changed his opinion about the fire after he spoke with an investigator from the BCSO and learned that their investigators found pieces of lithium in the trailer (*id.* at 113–15). Cioeta testified that the lab results also confirmed the conclusion that the fire was a meth fire, because the presence of a "petroleum distillate" was indicated in the samples he collected from the couch and floor (*id.* at 114).

On re-direct examination, Investigator Cioeta testified that "petroleum distillate" was "like Coleman fuel, which is one of the precursors in making of meth" (Trial Transcript at 119).

Jeff Haire, an investigator with the BCSO, testified he arrived at the fire scene and met with SFM Investigator Cioeta (Trial Transcript at 121–23). Investigator Haire testified that fireman had already moved the living room furniture to the front yard, but inside the trailer he saw the outline on the carpet where the furniture had

been (*id.* at 124). Investigator Haire testified he did not see any oil, grease, or smoke

damage in the kitchen (*id.*). He testified there was no evidence of grease or potatoes

anywhere on the premises (*id.* at 125). Investigator Haire testified he thought it was

odd that Osborn was not at the trailer or at the hospital with his child (*id.* at 127).

He testified he interviewed Michael Frank and Joy Martin (*id.* at 126). Investigator

Haire testified that when he left the scene, other officers were still there (*id.* at 136).

Investigator Haire testified that his supervisor, Captain Stanford, obtained a

search warrant for the trailer the next morning (August 24, 2009), so Haire returned

to the scene at 10:30 a.m. (Trial Transcript at 127–28). Investigator Haire testified

that the scene was unsecured overnight (*id.* at 136–37), but when he arrived the next

morning, the scene "seemed to be identical" to the night before (*id.* at 128).

Jamie Young, an investigator with the BCSO, testified he had Clandestine Lab

Certifications I and II, which trained him to recognize an indoor lab where illegal

substances were manufactured, such as methamphetamine, Ecstasy, LSD, and

marijuana (Trial Transcript at 159–61). Investigator Young testified he was also

certified in dismantling labs, including separating, moving, and processing certain

chemicals and then turning them over to hazardous waste disposers (*id.* at 161).

Young testified that his certification also included actually manufacturing narcotics, including meth (*id.* at 161–62).

Investigator Young testified he went to Osborn's trailer at approximately 10:00 a.m. on August 24, 2009 (the morning after the fire) (Trial Transcript at 164–65).  Young testified he observed a green soda-type bottle, with a white substance inside, sitting at the top of the garbage can in the kitchen (*id.* at 168).  Young testified that when he opened the bottle, he detected an odor of Coleman fuel (*id.* at 168).  Investigator Young testified he conducted a field test on the bottle, and it tested positive for the presence of pseudoephedrine, which is a "listed chemical" in Florida (*id.* at 169).

Investigator Young testified that lithium is also used in manufacturing meth (Trial Transcript at 172).  He testified that the boiling point for lithium is 1400 degrees, and it sparks or heats up when it reacts with moisture or oil from the skin (*id.* at 172–73).  Young testified that the burn spot on the living room floor just inside the front door was created by something so hot that it burned through the linoleum flooring  to the wood sub-floor (*id.*).  Young testified that he extracted a small solid substance from the "pit" of the burn (*id.* at 174).

Investigator Young testified he discovered a plastic measuring cup in the kitchen, with a white residue at the bottom (Trial Transcript at 175). Young testified he conducted a field test on the measuring cup, and it tested positive for the presence of pseudoephedrine (*id.* at 176). Investigator Young testified he discovered lye under the kitchen sink, which is commonly used in manufacturing meth (*id.* at 178).

Investigator Young testified that in the bathroom of the trailer, he discovered a two-pack box of cold packs with one cold pack missing, and the corner of a cold pack (Trial Transcript at 139–44, 156, 175, 180). The corner of the cold pack found inside Osborn's trailer was forensically matched to the cold pack found under the storage shed (*id.* at 348–49). Investigator Young testified that cold packs contain ammonia nitrate, which is used to manufacture methamphetamine (*id.* at 178–81).

Investigator Young testified he observed a white, powdery substance splattered all over the inside of the front door of the trailer and along the threshold at the bottom of the door (Trial Transcript at 182). Young testified he collected and conducted a field test on the powdery substance, and it tested positive for the presence of pseudoephedrine (*id.* at 183).

Investigator Young described the process of manufacturing meth, and testified that the following items are commonly used during the process: soda bottles, cold

packs containing ammonia nitrate, drain cleaner, pseudoephedrine, cold medication,

Coleman fuel, and lithium batteries (Trial Transcript at 184–89).

Investigator Paul Vecker testified he took a statement from Osborn on August

25, 2009, after he advised Osborn of his *Miranda* rights, and Osborn waived them

(Trial Transcript at 270).    Osborn told Investigator Vecker and Investigator Haire

that the fire started when he was heating oil to cook potatoes (*id.* at 301).    Osborn

told investigators that there were two bags of potatoes on the counter near the kitchen

sink (*id.* at 301–02).

This concludes the summary of the trial evidence related to Osborn's actual

innocence claim.    Osborn's claim is based upon two items of "new" evidence, a

statement from Carla Denise Capps and a statement from Fred Reese (*see* ECF No.

1 at 16–33).

Osborn asserts he obtained the following signed statement from Carla Denise

Capps on March 20, 2018:

> I , Carla Capps, being of sound mind, [w]itnessed on the night of the
> fire at John Osborn [sic] house where he resided on Mylisa Road
> Southport Florida in August 2009.  Him [sic] and Tessa Wagy [l]ived
> there about 2 months with 2 babies.  I lived over there the month of July
> 2009.  They moved in next door July 3, 2009.  During the month I had
> seen them approx. [sic] 2 times a week.  The babies were always clean
> and the house was always clean.  During this time I did not witness no
> [sic] traffic coming in and out other than the work truck that picked up

John [sic] everyday [sic] to go to work. I left my husband around the first of August 2009. I was in and out after that getting my personal belongings. The night of the fire I arrived about 10:30 P.M. [T]he only person on the scene was a dcf [child protective services] worker who introduced himself as Dallas. He was standing outside the trailer at the porch taking pictures of the play pen, blanket, sofa, [k]itchen trash can, and several pots in the yard and on the porch was a skillet holding open the door. I stayed about 1 1/2 hour [sic] and witnessed neighbors from the neighborhood going inside the residents [sic] of John and Tessa. When I left people from the neighborhood was [sic] still there about 12:30 A.M. No one from the sheriff or fire department was on scene. The following day I went over about 1 P.M. and the owner of the property and his daughter was cleaning the trailer. [T]he owner told me to come in and get what I wanted. Neighborhood people [s]till running in and out. The owner told me that they were told by the sheriff department that they were done and could clean it out to be rented out. Mr. Reese the owner cut a piece out of the floor in the kitchen with a knife put it in a plastic bag for me with gloves in case I ever needed it. [H]e also told me the sofa was in the dumpster and I could get it if I wanted it. I retrieved the diapers, bottles, blankets, car seat from inside the trailer. About 5 or 6 people was [sic] present and 5 kids were in the trailer. While I was there I ask [sic] them why were they cleaning up so soon to rent it out and I was told Bay County Sheriff Department told them that they were going to be gone a long time. I am coming forth now because nobody has ever ask [sic] me what I knew and I had the 2 month [sic] for about week [sic] until DCF picked him [sic]. DCF Dallas released the baby to me the night of the fire.

(*see* ECF No. 1 at 22–23; *see also* Ex. K at 25).

Osborn asserts he could not have discovered Ms. Capps' statement sooner, because she was not mentioned in the police report or the State's discovery materials (*see* ECF No. 17 at 3). Osborn also asserts Ms. Capps moved out of the

neighborhood prior to the fire, and he never knew she was in the neighborhood on the night of the fire (*id.*). Osborn alleges Ms. Capps' statement shows he is factually innocent of the crimes (ECF No. 1 at 16–33). He contends her statement demonstrates that the crime scene was not secure, thus, physical evidence relied upon by the State's expert, and also presented by the State at trial, could have been placed at the scene by neighbors (*id.*).

Osborn alleges additional evidence of his actual innocence is a statement from his landlord, Fred Reese, which Reese provided on September 21, 2009 (prior to Osborn's trial) (ECF No. 1 at 21–22; *see also* Ex. K at 30). In relevant part, Mr. Reese stated that there were cleaning supplies under the kitchen sink prior to the Osborn family's moving into the trailer (Ex. K at 30–32). Reese also stated that on the morning of August 23, 2009 (the day of the fire), he asked Osborn if he was having problems with the septic tank (*id.* at 30). Reese stated that Osborn responded yes and stated he had been using the lye he found under the sink to keep the septic tank "cleaned out" (*id.*). Reese stated he had the septic tank pumped that day (*id.*). Reese stated that after the fire, BSCO officers told him that the trailer was not contaminated and could be cleaned (*id.*).

Considering the trial evidence and Osborn's "new" evidence, Osborn has not shown that, more likely than not, any reasonable juror would have had reasonable doubt about his guilt if they had heard Ms. Capps' and Mr. Reese's statements. Ms. Capps states she witnessed people from the neighborhood entering and exiting Osborn's trailer, but she does not state she witnessed anyone entering with any of the meth-making substances or equipment that were found in the trailer (i.e., the soda bottle with pseudoephedrine residue, measuring cup with pseudoephedrine residue, cold packs, lye, and pseudoephedrine powder splattered on the front door). Nor does Ms. Capps state she witnessed anyone beginning new fires on the floor, walls, doors, or furniture. Ms. Capps' statement also does not explain the meth-making materials discovered under the storage trailer and in the dumpster, which were linked to Osborn. Ms. Capps' statement would not support a reasonable inference that any of the physical evidence was left by neighbors after the fire; therefore, her statement does not support a colorable showing of Osborn's factual innocence.

The same is true of Mr. Reese's statement. Even if the jury had heard Reese testify that there were cleaning products in the trailer before the Osborns moved in, this testimony would have cast little, if any doubt, on Osborn's guilt, considering the evidence collected from outside Osborn's trailer and the items collected from inside

the trailer which were not cleaning products (i.e., the soda bottle with pseudoephedrine residue, the measuring cup with pseudoephedrine residue, the cold pack, and the pseudoephedrine splattered on the front door).

In sum, Osborn's "new evidence" is not so significant and reliable that it undermines confidence in the result of Osborn's trial. Therefore, Osborn is not entitled to a federal merits review of Issue Two or Issue Three through the actual innocence gateway.

## III.    CONCLUSION

Issues Two and Three were not filed within the one-year federal statutory limitations period, and Osborn has not shown he is entitled to federal review of either of these claims through any recognized exception to the time bar. Therefore, the State's motion to dismiss should be granted as to Issues Two and Three.

To the extent Osborn attempts to present a substantive federal claim in Issue One, as opposed to a "gateway" claim of actual innocence, Issue One does not present a cognizable claim. Therefore, habeas relief should be denied as to Issue One

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, — U.S.—, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

Case No.:  5:20cv6/RV/EMT

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That Respondent's motion to dismiss (ECF No. 12) be **GRANTED** as to Issues Two and Three of Petitioner's habeas petition (ECF No. 1), and those two issues be **DISMISSED** as untimely.

2.     That Issue One of Petitioner's habeas petition (ECF No. 1) be **DENIED** for failing to state a cognizable claim.

3.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 20<u>th</u> day of October 2020.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**